IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

COURTHOUSE NEWS SERVICE,

*Plaintiff – Appellee,*

v.

GEORGE E. SCHAEFER, *et al.*,

*Defendants – Appellants.*

On Appeal from the United States District Court for
the Eastern District of Virginia, Norfolk Division,
Case No. 2:18-cv-391-HCM-LRL

BRIEF OF APPELLEE COURTHOUSE NEWS SERVICE

BRYAN CAVE LEIGHTON PAISNER LLP
Heather S. Goldman
Bryan J. Harrison
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
heather.goldman@bclplaw.com
bryan.harrison@bclplaw.com

William J. Hibsher
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Fax: (212) 541-4630
wjhibsher@bclplaw.com

WILLCOX & SAVAGE, P.C.
Conrad M. Shumadine
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com

*Counsel for Appellee*
*Courthouse News Service*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 20-1290      Caption: Courthouse News Service v. Schaefer, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Courthouse News Service
(name of party/amicus)

who is _____ Appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Heather S. Goldman          Date:          06/26/2020

Counsel for: Courthouse News Service

- 2 -

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ...........................................................................1

STATEMENT OF THE CASE.....................................................................2

I.    About CNS..........................................................................................3

II.   A Tradition of Contemporaneous Access to Newly-Filed Civil
      Complaints on Receipt.......................................................................4

      A.    A Nationwide Tradition of Access............................................5

      B.    Access at the Norfolk and Prince William Circuit Courts.....................5

            1.    Pre-Lawsuit Access at the Prince William Circuit Court ...........7

            2.    Pre-Lawsuit Access at the Norfolk Circuit Court.......................9

            3.    Gradual Improvements in Access .............................................11

III.  The Importance of Contemporaneous Access ..................................13

IV.   Procedural Background ....................................................................13

V.    Delay Calculations...........................................................................15

      A.    The Data Sets........................................................................16

      B.    Start Date ..............................................................................18

      C.    End Date ................................................................................19

      D.    Measure of Delay ..................................................................21

SUMMARY OF ARGUMENT ..................................................................23

ARGUMENT ............................................................................................25

I.    CNS Satisfied All of the Requisite § 1983 Factors, Establishing That the
      Clerks Violated its First Amendment Right of Contemporaneous Access...25

II. The District Court Correctly Held That There is a First Amendment Right of Access to Newly-Filed Civil Complaints and That Such Access Must be Contemporaneous. ..................................................28

    A. The First Amendment Guarantees a Right of Access to Civil Complaints..................................................................................28

        1. The Experience and Logic Prongs are Met: There is a Long-Standing History of Access to Civil Complaints and Public Access Plays a Significant Role in the Judicial Process...........31

            The Experience Prong..................................................................31

            The Logic Prong...........................................................................32

        2. The Analytical or "Critical Component" Test is Also Met ......33

    B. The Public and Press Have a Contemporaneous Right of Access to Newly-Filed Civil Complaints ............................................................34

III. The Clerks Violated the First Amendment by Failing to Provide Contemporaneous Access to Newly-Filed Civil Complaints........................36

    A. Application of Strict Scrutiny is Required ...........................................37

    B. The Clerks' Practices and Customs Resulted in Delayed Access to Newly-Filed Civil Complaints .............................................................38

    C. The Clerks Did Not (and Cannot) Satisfy Their Burden to Demonstrate That Their Policies, Practices, and Customs are Narrowly Tailored to Serve Compelling Government Interests. ........39

IV. The District Court Did Not Abuse its Discretion in Rejecting the Clerks' Belated Motion for Abstention ....................................................................41

    A. *Younger* Abstention is Improper. .......................................................42

    B. The District Court Did Not Abuse Its Discretion Refusing to Abstain Under "The More Generalized Principles of Federalism" or Under *O'Shea* or *Rizzo*.....................................................................43

        1. *O'Shea*...................................................................................44

        2. *Rizzo* ......................................................................................45

C.     The District Court Did Not Abuse Its Discretion in Denying the Clerks' Abstention Motion as Untimely. ..............................................46

V.     The District Court Correctly Found the Case Not Moot and Its Issuance of Declaratory Relief Was Proper ................................................................47

VI.    The District Court Acted Within Its Discretion to Deny the Clerks' Motion to Sever Claims on Misjoinder and Venue Grounds. ........................51

Misjoinder ..............................................................................................51

Venue .....................................................................................................53

CONCLUSION ..............................................................................................................53

# TABLE OF AUTHORITIES

<strong>Page(s)</strong>

**Cases**

*6th Cong. Dist. Republican Comm. v. Alcorn*,
  913 F.3d 393 (4th Cir. 2019) ...................................................................48

*ACLU v. Holder*,
  652 F. Supp. 2d 654 (E.D. Va. 2009),
  *aff'd*, 673 F.3d 245 (4th Cir. 2011)......................................................31

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013)....................................................................................48

*Ankenbrandt v. Richards*,
  504 U.S. 689 (1992)..................................................................................42

*Baltimore Sun Co. v. Goetz*,
  886 F.2d 60 (4th Cir. 1989) ...............................................................28, 30

*Bernstein v. Bernstein Litowitz, Berger & Grossman LLP*,
  2016 WL 1071107 (S.D.N.Y. Mar. 18, 2016),
  *aff'd*, 814 F.3d 132 (2d Cir. 2016)........................................29, 33, 34

*Bernstein v. Bernstein Litowitz, Berger & Grossman LLP*,
  814 F.3d 132 (2d Cir. 2016) ...............................................................31, 33

*Carter v. Morris*,
  164 F.3d 215 (4th Cir. 1999) ...................................................................27

*In re Charlotte Observer*,
  882 F.2d 850 (4th Cir. 1989) ...................................................................36

*CNS v. Brown*,
  2018 WL 318485 (N.D. Ill. Jan. 8, 2018),
  *rev'd on other grounds*, 908 F.3d 1063 (7th Cir. 2018) ...............29, 44

*CNS v. Jackson*,
  2009 WL 2163609 (S.D. Tex. July 20, 2009) ...................................22, 29

*CNS v. Planet*,
750 F.3d 776 (9th Cir. 2014) ......................................................29, 33, 36, 45

*CNS v. Planet*,
614 F. App'x 912 (9th Cir. 2015) ...................................................................33

*CNS v. Planet*,
947 F.3d 581 (9th Cir. 2020) ...............................................................*passim*

*CNS v. Tingling*,
2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) ....................................22, 29, 42

*CNS v. Yamasaki*,
312 F. Supp. 3d 844 (C.D. Cal. 2018),
*vacated and remanded*, 950 F.3d 640 (9th Cir. 2020)......................................29

*Davison v. Plowman*,
191 F. Supp. 3d 553 ..................................................................................49, 50

*Deal v. Mercer Cty. Bd. Of Educ.*,
911 F.3d 183 (4th Cir. 2018) ....................................................................49, 50

*Doe v. Public Citizen*,
749 F.3d 246 (4th Cir. 2014) ...............................................................*passim*

*Gerstein v. Pugh*,
420 U.S. 103 (1975)........................................................................................45

*Hartford Courant Co. v. Pellegrino*,
380 F.3d 83 (2d Cir. 2004) .......................................................................30, 42

*Hawaii Hous. Auth. v. Midkiff*,
467 U.S. 229 (1984).......................................................................................47

*Hill v. Snyder*,
878 F.3d 193 (6th Cir. 2017) ..................................................................... 46-47

*Iron Arrow Honor Soc'y*,
567 U.S. 298 (2012)........................................................................................49

*Knox v. Serv. Emps. Int'l Union*,
464 U.S. 67 (1983)..........................................................................................49

*Los Angeles Cty. v. Humphries*,
  562 U.S. 29 (2010) .........................................................................26

*Lugosch v. Pyramid Co.*,
  435 F.3d 110 (2d Cir. 2006) ...........................................................30

*Lyons P'ship, L.P. v. Morris Costumes, Inc.*,
  243 F.3d 789 (4th Cir. 2001) .....................................................48, 49

*Lytle v. Doyle*,
  326 F.3d 463 (4th Cir. 2003) .....................................................25, 26

*Martin v. Stewart*,
  499 F.3d 360 (4th Cir. 2007) ..........................................................41

*Maryland Cas. Co. v. Pac. Coal & Oil Co.*,
  312 U.S. 270 (1941) .......................................................................48

*Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*,
  674 F.3d 369 (4th Cir. 2012) .....................................................38, 40

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978) ..................................................................26, 27

*Nivens v. Gilchrist*,
  319 F.3d 151 (4th Cir. 2003) ..........................................................42

*Nixon v. Warner Commc'ns Inc.*,
  435 U.S. 589 (1978) .......................................................................28

*O'Shea v. Littleton*,
  414 U.S. 488 (1974).................................................................24, 44

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986).......................................................................27

*Porter v. Clarke*,
  852 F.3d 358 (4th Cir. 2017) ..........................................................49

*Press-Enterprise Co. v. Superior Court*,
  478 U.S. 1 (1986)...........................................................................30

*Reynolds v. Middleton*,
779 F.3d 222 (4th Cir. 2015) ...................................................................................39

*Rivera-Puig v. Garcia-Rosario*,
983 F.2d 311 (1st Cir. 1992)..................................................................................42

*Rizzo v. Goode*,
423 U.S. 362 (1976)..........................................................................................24, 45

*Robinson v. Thomas*,
855 F.3d 278 (4th Cir. 2017) ...................................................................................42

*Saval v. BL, Ltd.*,
710 F.2d 1027 (4th Cir. 1983) .............................................................................51, 52

*Semple v. City of Moundsville*,
195 F.3d 708 (4th Cir. 1999) ...............................................................................26, 27

*Sprint Communications, Inc. v. Jacobs*,
571 U.S. 69 (2013)..................................................................................................42

*Steffel v. Thompson*,
415 U.S. 452 (1974)................................................................................................45

*Timmons v. Andrews*,
538 F.2d 584 (4th Cir. 1976) ...................................................................................41

*U.S. v. Russell*,
971 F.2d 1098 (4th Cir. 1992) .................................................................................16

*U.S. v. Slager*,
912 F.3d 224 (4th Cir.), *cert. denied*, 139 S. Ct. 2679 (2019) ............................15

*United Mine Workers of Am. v. Gibbs*,
383 U.S. 715 (1966)................................................................................................52

*Va. Dep't of State Police v. Wash. Post*,
386 F.3d 567 (4th Cir. 2004) ...................................................................................39

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*,
386 F.3d 581 (4th Cir. 2004) ...................................................................................48

*Wall v. Wade*,
741 F.3d 492 (4th Cir. 2014) ......................................................................48, 50

*Younger v. Harris*,
401 U.S. 37 (1971)..............................................................................24, 42, 43

**Statutes**

28 U.S.C. § 1391(b)(1)..............................................................................53

42 U.S.C. § 1983 ...............................................................2, 26, 27, 46

**Other Authorities**

Federal Rule of Civil Procedure 20(a)(2) .............................................................51

E.D. Va. Loc. Civil Rule 3(C) ...............................................................53

http://www.vaed.uscourts.gov/ecf/documents/VAED_CivilOpeningC
URRENT_07_02_19.pdf ...............................................................13

Appellee Courthouse News Service ("CNS") responds in opposition to the appeal filed by Appellants George E. Schaefer, in his official capacity as Clerk of the Circuit Court for Norfolk, Virginia, and Jacqueline C. Smith, in her official capacity as Clerk of the Circuit Court for Prince William County, Virginia (together, the "Clerks"):

## STATEMENT OF ISSUES

1.      Whether the First Amendment right of access applies to newly-filed civil complaints, as recognized by the District Court and as uniformly recognized by several other federal district and circuit courts that have addressed the issue?

2.      Whether the District Court correctly concluded that the First Amendment right of access requires "contemporaneous access" to newly-filed civil complaints, and that "contemporaneous access" means on "the same day on which the complaint is filed, insofar as is practicable"?

3.      Whether the District Court's determinations of witness credibility and weighing of evidence with respect to the Clerks' policies, practices, and procedures and the resulting delays in access should be accepted?

4.      Whether the District Court acted within its discretion in exercising jurisdiction and issuing declaratory relief where it determined not only the existence of the alleged constitutional violations, but found a "real risk" that the Clerks would revert to the constitutional violations absent equitable relief?

5.	Whether the District Court acted within its discretion in denying the Clerks' belated abstention motion because it failed to meet the "exceptional" circumstances required for abstention to apply, as well as for being untimely?[1]

6.	Whether the District Court acted within its discretion in denying the Clerks' request to sever Jacqueline Smith for supposed misjoinder.

## STATEMENT OF THE CASE

CNS filed this 42 U.S.C. § 1983 action in July 2018 seeking declaratory and injunctive relief to address the Clerks' practices, customs, and policies of withholding new civil complaints from public or press review until they had been posted to public access terminals – after administrative processing and scanning – which resulted in substantially delayed access in violation of the First Amendment. Following extensive discovery and motions practice, a four-day bench trial was held from January 31 to February 5, 2020. In addition to ruling from the bench, the District Court entered an Opinion and Order on February 21, 2020, finding and

---

[1]	The Clerks have included issues not certified by the District Court in this appeal (i.e., abstention, venue, and misjoinder). *See* CNS' Motion to Clarify, Case No. 20-1386, ECF 14. In its Opinion, the District Court granted the Clerks' request for a Rule 54(b) certification, and certified five specifically-enumerated issues. J.A.1508-1509/Opinion. On April 2, 2020, this Court agreed to hear the interlocutory appeal only as to the five certified issues, and rejected exercising pendent appellate jurisdiction over any non-certified issues. Case No. 20-162, ECF 20. Although CNS believes the Clerks should be prohibited from bootstrapping issues not properly before this Court, CNS responds to all of the issues raised in the Clerks' appeal brief (ECF 24, "Appeal").

concluding that "(1) the First Amendment guarantees a qualified right to access newly-filed civil complaints contemporaneously with their filing, and (2) that during the months of January of 2018 through June of 2018 and for a period of time thereafter, [the Clerks] deprived [CNS] of that right." J.A.1509-1510/Opinion. The District Court granted CNS' request for a declaratory judgment. *Id.* While the District Court denied CNS' request for an injunction, it did so without prejudice and retained jurisdiction, ordering that "[t]he parties should monitor the levels of access provided by [the Clerks] for six (6) months" and "file a joint status report on the level of access," at which time CNS could renew its request for injunctive relief. J.A.1508/Opinion.

## I.     **About CNS**

CNS is a nationwide news service that reports on civil ligation in state and federal courts throughout the country. J.A.1467/Opinion. Founded in 1990, CNS employs 250 reporters who visit courthouses and report on the day's civil complaints for publication in CNS' New Litigation Reports, which are sent to subscribers by the end of each day. J.A.1468/Opinion. The New Litigation Reports generally include reports on new civil complaints involving business entities, government offices, and prominent individuals. J.A.1142/Abbott 277:14-24. In addition to its New Litigation Reports, other CNS publications include a

publicly available website, www.courthousenews.com, which is read by hundreds of thousands of people each month.  J.A.1468/Opinion; J.A.846/P-27.

The New Litigation Reports have more than 2,200 subscribers nationwide, including law firms, academic institutions, publicly traded companies, government entities, non-profit organizations, and news and entertainment media outlets. J.A.1467/Opinion; J.A.802-809/P-3; J.A.810-811/P-4.  Other media outlets rely on CNS to learn about newly-filed litigation.  J.A.1469/Opinion; J.A.810-811/P-4. CNS' founder and publisher, William Girdner, testified that economic considerations caused media outlets to cut back on court reporters over the years and that CNS is now effectively the "eyes and ears" for the general press in regard to new civil filings.  J.A.912/Girdner 47:23-25.  CNS has been credited as the original source of reporting by newspapers, legal publications, magazines, television, radio, and online media.  J.A.1469/Opinion; J.A.812-813/P-5.

## II. A Tradition of Contemporaneous Access to Newly-Filed Civil Complaints on Receipt[2]

As the District Court observed:  "Legal news, like all other news, has a short shelf-life.  Accordingly, it is important for news providers to have contemporaneous access to public documents."  J.A.1467/Opinion.  A new civil

---

[2]  While the Clerks' ignore the tradition of access in their brief – and, indeed, objected to testimony on the subject at trial, J.A.903/Prince 38:4-7 – the tradition "bears on the First Amendment issue."  J.A.903/J. Morgan 38:8-9.

complaint represents the moment when a private dispute enters a public forum utilizing a branch of government to resolve a matter, and that in order to properly and promptly inform its readership, CNS needs access to new civil filings on the day they are filed. J.A.921/Girdner 56:12-19. Based on trial evidence, the District Court noted the "press and public, have historically enjoyed a tradition of court clerks making most newly-filed civil complaints available on the day that they are filed." J.A.1469/Opinion.

## A. A Nationwide Tradition of Access

Girdner began covering courts in 1985, starting in the federal court for the Central District of California. He testified that he and other reporters covering the courthouse would go to the clerk's office before closing every day to review the day's civil filings maintained in a stack on the counter. J.A.899-900/Girdner 34:15-35:10. As CNS' coverage expanded to include state and federal courts across the country, Girdner found that the practice of allowing members of the press to review new filings before closing was universal. J.A.900/Girdner 35:11-24.

## B. Access at the Norfolk and Prince William Circuit Courts

The Clerks are the custodians of their respective courts' records, including new civil complaints, and are responsible for developing and implementing the policies and procedures for the maintenance and administration of those records

and for ensuring that those records are available for examination by the public. J.A.1469-1470/Opinion; Appeal at 5, 6. The Clerks act through their employees and delegate to their employees the responsibility of responding to requests for court records, including new civil complaints. J.A.1470/Opinion.

A party seeking to file a civil complaint may do so by delivering a paper copy to the clerks' office by hand or by mail, or by electronic filing ("e-filing"). *Id.*[3] The parties agree that a new civil complaint filed in paper goes through three stages of processing before it can be viewed on the public access terminals: (1) Initial Intake – a deputy clerk at the intake counter receives a new complaint, stamps "filed" and the date on the face of the complaint, skims the document, enters partial docket information into the Court's Financial Accounting System ("FAS"),[4] which calculates the filing fee, receives and records the payment, and generates a case number; (2) CCMS Data Entry – a deputy clerk enters additional case information into the Circuit Case Management System ("CCMS"); and (3) Scanning – at some point after CCMS data entry, the deputy clerk scans the

---

[3]  While the Norfolk and Prince William Circuit Courts offer voluntary e-filing, the overwhelming majority of complaints are filed in paper. J.A.440-801/Joint Ex. 1.

[4]  The Clerks' offices use several technology platforms maintained by Virginia's Office of the Executive Secretary ("OES") when processing a new civil complaint. *See* J.A.1470/Opinion; Appeal at 6. The Clerks misstate CNS' injunction request – CNS never requested an injunction enjoining the Clerks from using these systems. *See* Appeal at 6.

complaint into digital form in the Case Imaging System ("CIS") and, once scanned, the complaint is linked to the CCMS docket and can be viewed on the public access terminals. *See* J.A.1471-1475/Opinion; Appeal at 6-7.

Fewer steps are required for the small number of e-filed complaints to be processed. After an attorney submits an e-filing, it is accepted by the clerks and made available to the public on the public access terminals. *Id.*

### 1. Pre-Lawsuit Access at the Prince William Circuit Court

CNS has covered the Prince William Circuit Court since at least 2004, and as part of an expansion of coverage in Virginia, began covering it on a daily basis in September 2017. J.A.1111-1112, 1156-1157/Abbott 246:20-247:11, 291:7-8, 292:1-7; J.A.926/Girdner 61:1-16. From 2004 until approximately January 2018, CNS' reporters were able to review new civil complaints on the day filed, regardless of whether processing had been completed. Ryan Abbott, CNS' Southeast Bureau Chief, testified that when he was a reporter, access at the Prince William Circuit Court was "excellent," and that he could see all new general civil complaints by looking through a stack in a wire basket on the clerk's counter. J.A.1124-1125/Abbott 259:23-260:7. With the implementation of scanning and voluntary e-filing, new complaints were made available on the public access terminals after processing, and were also provided to CNS' reporters, upon request, in paper form before processing. *See* J.A.1120/Abbott 255:20-22.

In Fall 2017, CNS' reporter started having trouble getting access to new civil complaints prior to scanning. J.A.927/Girdner 62:13-16, J.A.1121-1122/Abbott 256:2-257:13. As a result, CNS began to track access by recording on a daily basis the date a new civil complaint was filed and the date it became available. J.A.928-929/Girdner 63:16-64:2; J.A.1131/Abbott 266:12-17. Tracking suggested that access to newly-filed complaints was substantially delayed, with only 27% of newly-filed cases being made available on the day of filing. These delays gave rise to the complaint in this action.[5]

Abbott testified that he visited the Prince William Circuit Court in November 2017. He had a list of 23 cases (some had been missing for days and others for a week or more) which, based on a review of the docket information, appeared to be newsworthy but were not yet available for viewing on the public access terminals. J.A.1121-1122/Abbott 256:21-257:8. Abbott testified that after asking to review those cases, Brenda Elford, the Civil Division supervisor, told

---

[5] At trial, and now, the Clerks incorrectly argue that CNS decided to file suit prior to September 2017 and that the tracking was undertaken in anticipation of litigation. To support their theory, they rely on several e-mail and text message communications between Abbott and his reporters. *See* Appeal at 11-12. But as the District Court found at trial, Abbott's e-mails "don't show much of anything." J.A.1159-1160/J. Morgan 294:20-295:2. And, as Abbott testified: "I wanted to rally the troops. My reporters needed to know how serious their data collection was." J.A.1136/Abbott 271:1-3. In addition, when presented with the Clerks' theory at trial, Girdner testified that it was "false." J.A.965/Girdner 100:19-22. Testimony made clear that CNS routinely tracks the courts it covers. J.A.929-930/Girdner 64:10-18, 65:7-10; J.A.1132/Abbott 267:15-17.

him that the new filings "were public record," and he was provided 21 of the 23 cases that day. *Id.* On that visit, Abbott noticed that a sign had been posted throughout the clerk's office that said the staff had ten days to scan filings. J.A.1122, 1164-1165/Abbott 257:12-13; 299:21-300:1. Smith admits that a sign was posted in her office in November 2017 that states: "We are dedicated to scanning all civil filings into our digital system within ten (10) days of receipt in this office." Appeal at 10.

In January 2018, Abbott returned to the Prince William Circuit Court to train Joan Hennessy, CNS' new reporter, over the course of four days. J.A.1122/Abbott 257:17-20. While the clerks' office found unscanned complaints for Abbott and Hennessy on the first day of training, J.A.1122-1123/Abbott 257:22-258:5, on the second day, they were told by Elford that CNS "could not see new complaints until they were available on the public access terminals – after intake, CCMS data entry, and scanning." J.A.1477/Opinion. During trial, Smith confirmed that access to newly-filed cases had to wait until after full administrative processing, including being scanned to the public access terminals. J.A.1269/J. Smith 404:2-6.

### 2. Pre-Lawsuit Access at the Norfolk Circuit Court

CNS has covered the Norfolk Circuit Court since at least 2005, and as part of its expansion of coverage in Virginia, began covering it on a daily basis in September 2017. J.A.1127/Abbott 262:6-8. In August 2017, Abbott visited the

Norfolk Circuit Court and other courts in the Commonwealth. J.A.1127-1128/Abbott 262:14-263:1. During his visit to the Norfolk Circuit Court, he looked for newly-filed cases at the public access terminal and found several that had gone through intake (stage 1) but had not yet been scanned in (stage 3). Abbott introduced himself as a reporter and asked to review the civil complaints that had been filed but not yet fully processed and scanned. J.A.1128-1129/Abbott 263:21-264:3; 264:8-22. He spoke to Sonya Turner (who was summoned from the back office); she denied his request:

> She said that I have to wait for cases to be scanned in in order to access them. I asked her why, and she said that they were scattered on people's desk in the back and it will be too laborious to find each one that I need. I asked her if I could go in the back to look for the complaints, and she said no, that the clerk's office that was directly behind her was employees only.

*Id.* 264:11-18. When asked about this conversation at trial, Schaefer, who contended that the press is afforded special access via an unwritten policy in Norfolk, and his Chief Deputy, Thomas Larson, testified that: "[S]he got it wrong." J.A.1215/Schaefer 350:5; J.A.989/Larson 124:16-19.[6] While the Norfolk Clerk contends that "members of the media are permitted access behind the

---

[6] While the Clerks say CNS should have contacted Schaefer (and Smith) directly, the District Court stated at trial: "They shouldn't have to ask…. The policy should be made available. The burden shouldn't be on the citizens to ask what the policy is when there's a policy printed and posted in the clerk's office which suggests otherwise." J.A.881/J. Morgan 16:3-6.

counter," Appeal at 8, he also conceded that "[t]here is a sign on the door to the non-public area of the Clerk's office that says, "Officers of the Court." *Id.* Noting the existence of this sign, the District Court observed that "[t]he Norfolk Clerk does not have any written policies for providing the public or media with access to new civil complaints." J.A.1476/Opinion.

After the denial in access, CNS began tracking in the Norfolk Circuit Court. That tracking confirmed that access to newly-filed complaints was substantially delayed – only 16% of newly-filed cases were made available on the day of filing – and gave rise to the allegations in the complaint.

In September 2018, following the filing of this action, the Norfolk Clerk and his staff met with Abbott and Jocelyn Rardin, the CNS Norfolk reporter, and informed them that CNS would be permitted behind the counter to review cases before full processing. J.A.1476/Opinion; J.A.1130-1131/Abbott 265:17-266:11. The District Court concluded that until this meeting, it was Norfolk's policy, custom, and practice to make cases available only after full processing and only on the public access terminals. J.A.1476/Opinion.

3.     Gradual Improvements in Access

After this suit was filed, access at both the Norfolk and Prince William Circuit Courts gradually improved, as court staff began processing complaints more quickly and began allowing CNS to occasionally review complaints before

they had been fully processed and posted to the public access terminals. J.A.1163/Abbott 298:15-21.[7]  As a result of these improvements, Abbott testified at a February 2019 deposition that delays were "rare."  J.A.1136-1137/Abbott 271:20-272:9.[8]  Based upon the evidence, the District Court found that the courts "began achieving the 80-85% level of access and better in late 2018" and that CNS' "evidence indicates that they have continued to do so up to the present date." J.A.1486/Opinion.

Notwithstanding changes that occurred *after* this action was filed, the evidence presented at trial showed that, between January 1 and June 30, 2018 (the "Relevant Period") both Clerks had a "policy, custom, and practice of providing access to complaints only after full processing, including scanning and being made available for viewing on the public access terminals," and that access during the Relevant Period "was deficient." J.A.1476, 1482/Opinion.

---

[7]  In Norfolk, the CNS reporter was permitted to go behind the counter and review complaints. J.A.1131/Abbott 266:6-11.  In Prince William, the CNS reporter was allowed to ask (once again) for newly-filed civil complaints that had not yet been posted to the public access terminals. J.A.1140/Abbott 275:7-16.

[8]  The Clerks incorrectly assert that "[i]t was undisputed at trial that, since filing this lawsuit, CNS rarely experiences access delays." Appeal at 23.  In fact, access improved gradually, over months, after this suit was filed. J.A.1163/Abbott 298:15-21.

### III. The Importance of Contemporaneous Access

Contemporaneous access by the end of the day of filing is important to the press and to the public.

> If you try to take old news and push it into that current cycle, the old news automatically goes in underneath, like a lower strata. It's not as widely read, it's not as valuable or important.

J.A.921/Girdner 56:10-19. Understanding the importance of contemporaneous access, the District Court stated, "if you don't get [the news] when it's fresh, it's like stale bread or stale anything else." J.A.1425-1426/J. Morgan 560:25-561:2.

If contemporaneous access is not provided, reporters cannot see for themselves the factual allegations and legal claims in the complaint. In an era of 24/7 digital news coverage, where old news is quickly buried by something more current, the result of delayed access is that new complaints, some of great importance, fall by the news wayside.

### IV. Procedural Background

On July 19, 2018, CNS filed its complaint.[9] After the commencement of the action, the Clerks challenged CNS' delay data and alleged that all filings were

---

[9] The Clerks note that the complaint was not made available on PACER until July 20, 2018. Appeal at 13 n.5. But they ignore that the Eastern District of Virginia changed its practices in November 2018 to bring them in line with the vast majority of other federal district courts where new complaints flow onto PACER as soon as they are received by the court. *See* http://www.vaed.uscourts.gov/ecf/documents/VAED_CivilOpeningCURRENT_07

made available promptly.  J.A.41-42, 53-56/Prelim. Inj. Opp.  Because there was a factual dispute regarding whether delays existed, CNS withdrew its preliminary injunction motion.  ECF 26-EDVA.

The Clerks filed a series of dispositive motions: a motion to dismiss based on the failure to name a necessary and indispensable party – OES – and on misjoinder of Smith, ECF 21-EDVA; then, five months later, a second motion to dismiss based on abstention.  ECF 35-EDVA.  Thereafter, the parties cross-moved for summary judgment.  ECF 53-EDVA & ECF 56-EDVA.  The motions were all denied.  ECF 48-EDVA & ECF 97-EDVA.

There was also substantial discovery – voluminous document productions, interrogatories, requests for admission, and 13 depositions.  After numerous requests, and following a third party deposition of an OES designee, CNS obtained data from OES confirming the access delays.[10]  The OES data showed, in relevant part, date and time data as to the filing, processing, and public availability of new

---

_02_19.pdf.  Similarly, in the Fourth Circuit, filings can be seen on PACER upon submission.

[10]  The Clerks could have obtained this data from OES at any time and quickly verified CNS' allegations, potentially prompting early resolution. Instead, the Clerks denied the delays and mounted an aggressive defense.  After months of discovery, CNS eventually discovered and obtained the OES data. The Clerks repeatedly sought to avoid the merits of this case through dispositive motions raising procedural grounds and abstention.  Even now, on appeal they try to gloss over the OES data confirming the delays.

civil complaints in both the Norfolk and Prince William Circuit Courts. J.A.440-801/Joint Ex. 1; J.A.1273/R. Smith 408:7-14.

Ruling from the bench after a four-day bench trial, the District Court issued a declaratory judgment granting the relief sought by CNS.

## V.    <u>**Delay Calculations**</u>

From the beginning of this case, the Clerks disputed that there were any delays in access to new filings. J.A.41-42, 53-56/Prelim. Inj. Opp. In considering the conflicting testimony regarding delays presented by the parties and their experts, the District Court focused on four key points: (1) the data set; (2) the start date; (3) the end date; and (4) the measure of delay. The District Court found that CNS' expert's opinions were "entitled to significant weight" and that the Clerks' expert's opinions were "of no value to this case." J.A.1481-1482/Opinion. Deference should be given to the District Court's findings regarding the experts because "evaluating the credibility of experts and the value of their opinions is … a function best committed to the district courts, and one to which appellate courts should defer[.]" *U.S. v. Slager,* 912 F.3d 224, 234 (4th Cir.), *cert. denied*, 139 S. Ct. 2679 (2019).[11]

The Court also conducted its own *de novo* review of the raw OES data in order to "compare it to the conclusions of the expert witnesses."

---

[11] Unless noted, emphases are added and citations to internal quotations are deleted.

J.A.1482/Opinion. Based on that review and the trial testimony, the Court concluded that "the level of access at both the Norfolk and Prince William Clerks' Offices was deficient" during the Relevant Period. *Id.*

### A. The Data Sets

CNS' expert, Amita Kancherla, used the same set of cases tracked by the CNS reporters (584 complaints in Norfolk and 672 complaints in Prince William), but based her conclusion on the OES data.[12] While the Clerks' expert, David Harless, criticized Kancherla's data set and called it "a convenient sample," J.A.1341/Harless 476:12-18, Kancherla testified that her data set constituted a "very robust sample" of general civil complaints – the filings at issue in the litigation – in both courts. J.A.1075, 1108-1109/Kancherla 210:2-8, 243:19-244:3.

Harless, on the other hand, based his conclusions on all civil filings – approximately 5,000 in Norfolk and 6,000 in Prince William, J.A.1302/Harless 437:14-19, notwithstanding the fact that all civil filings include many routine documents, *i.e.*, driving restoration privileges, marriage celebrant registrations, name change petitions, and concealed hand carry permits, which are never made public. Indeed, Harless conceded that, for the Relevant Period, 58% of civil filings

---

[12] In overruling the Clerks' objection to the admission of the CNS tracking data, which Kancherla used for comparison purposes, the District Court found that the data "is a record kept in the ordinary course of business." J.A.1133/J. Morgan 268:2-12. The District Court's evidentiary determination is entitled to "substantial deference" and this determination should "not be disturbed absent a clear abuse of discretion." *U.S. v. Russell*, 971 F.2d 1098, 1104 (4th Cir. 1992).

in Prince William and 26% in Norfolk were confidential filings that were never made public.  J.A.1340-1341/Harless 475:17-476:5.  *See also* J.A.440-801/Joint Ex. 1 (confidential filings are highlighted in yellow).

In analyzing the experts' data sets, the District Court stated that:  "Harless relied on an incorrect data set" by "consider[ing] all initial civil filings … despite the fact that this litigation centers around general civil complaints." J.A.1478/Opinion.  The District Court also noted that "[b]oth Clerks testified that all civil filing [was] handled in the same manner" and that "therefore, tracing the subset of filings at issue should yield the same results as tracing all civil filings." J.A.1502/Opinion.  *See* J.A.1011/Larson 146:3-5; J.A.1257-1258/J. Smith 392:25-393:2.  Indeed, the Clerks admit they "do not discriminate against new civil filings" and all civil filings are "treated by both Clerks with equal dignity to any other civil complaint."  Appeal at 13.

Although the Clerks assert that underlying data used by the district court in its *de novo* review "cannot be discerned" and that it is "unclear whether the district court used CNS's 'convenience sample' or the totality of the OES Filing Data," Appeal at 25, the District Court states that the data it used in its *de novo* review was "drawn from the entirety of Joint Exhibit 1" – the OES data – and that it "**INCLUDED**" the specific "categories of civil complaints, as are appropriately deemed 'general civil complaints'" and "**EXCLUDED** initial civil filings that are

not 'general civil complaints.'" J.A.1482-1483/Opinion (providing list of OES categories used) (emphasis in original). The Clerks argue that there is no such category of general civil complaints under Virginia law, but the District Court noted that "the clerks, they understand exactly what it means." J.A.1324/J. Morgan 459:5-6. Indeed, Larson testified that not all civil filings are general civil complaints. J.A.986/Larson 121:1-3.

### B.    Start Date

For the start date, Kancherla chose the date filed as recorded in the OES data and compared it to the date filed as recorded by the CNS reporters on their tracking sheets. Noticing some discrepancies, Kancherla testified that she visited the Norfolk and Prince William Circuit Courts to examine the actual complaints and ascertain the stamped file date on the face of the complaint, which she used as her start date. J.A.1065-1066/Kancherla 200:10-201:13.[13]

For his starting point, Harless considered the file date as recorded in the OES data, but he did not correct the data to reflect the date stamped on the

---

[13]   Testimony confirmed that a complaint is considered filed when received by the Court. J.A.978/Larson 113:6-13; J.A.1172/Elford 307:19-21; J.A.1230/Schaefer 365:7-11. The OES system auto populates the "filed date" as the date upon which the data was first entered into the FAS or CCMS system. J.A.1067/Kancherla 202:2-12. If data entry does not occur until a day after the case was filed and date stamped, the clerks are expected to manually correct the file date in the system to match the date of the stamp. *Id.* Where the clerks failed to make that correction, the OES file date would not match the actual filed date stamped on the complaint. J.A.1067-1070/Kancherla 202:2-205:2; J.A.1185-1186/Elford 320:24-321:8.

18

complaints. Harless contended that the file stamp date did not necessarily correlate to the date that cases were "ready to be filed" because there could be problems with the filing or with the filing fee. J.A.1303/Harless 438:1-13. He conceded, however, that he had no data for the frequency of such instances and he made no adjustments in the OES file date based on that theory. J.A.1304, 1343-1344/Harless 439:23-24; 478:13-479:13.

## C. End Date

For her end date (*i.e.*, the date the complaint became available to the public), Kancherla relied on the date recorded by OES for when a complaint was scanned into CIS (the last step before the complaint is made immediately available on the public access terminals) but compared it with the date available as recorded by CNS' reporters on the tracking sheets. J.A.1050/Kancherla 185:10-13. Where there were discrepancies in the data, Kancherla used the earlier of the two dates.

Instead of using the OES-recorded scan date as the date when a complaint became available for viewing, Harless used the date on which the clerks *first* entered data about a case into the system. J.A.1342/Harless 477:7-10. Thus, Harless calculated delays by analyzing the amount of time that elapsed between the OES-recorded file date and the date when the filing fee was processed and initial case data entered, all of which occur during stage one of processing. Harless conceded on cross examination that several steps followed the processing of the

19

filing fee before public availability after scanning, J.A.1330/Harless 465:13-22, yet he wholly failed to account for the time that elapses between initial intake (the first stage) and scanning (the last stage). J.A.1330-1331/Harless 465:8-466:12.[14] As found by the District Court, the data point selected by Harless as his end date "does not include specific information about the allegations and legal theories of the lawsuit that one would find in a complaint," which "is publicly available when the pleading itself is scanned into CIS." J.A.1479-1480/Opinion.

While Harless acknowledged that cases became publicly available only after scanning, he rejected Kancherla's reliance on that OES data point because of the possibility that cases could be rescanned on a date after the initial scanning. J.A.1306/Harless 441:7-17. However, the testimony at trial was clear – "re-scanning usually happens immediately after an error is discovered on the filing date," and therefore would not change the date recorded by OES. J.A.1480/Opinion; J.A.984-985/Larson 119:18-120:25 (rescanning occurs as soon as the clerk's office finds a scanning error, and he could not remember the last time

---

[14] Harless explained that he rejected the possibility that administrative processing could carry over to a day after filing because the clerks assured him they only "handle[d] paper once" and he assumed the process was completed once started. J.A.1309/Harless 444:17-25. However, when confronted with testimony from the clerks that there are times when workloads "stack up" and clerks are not always able to finish processing on the day of filing, Harless conceded that "there were circumstances where they weren't able to process all newly filed civil complaints on the day that they were received…." J.A.1332, 1334-1335/Harless 467:18-23, 469:14-470:6.

rescanning occurred after the day of initial scanning); J.A.1181/Elford 316:11-13 ("very little" are rescanned).  And, as noted by the District Court, "Harless could not quantify how often re-scanning occurred."  J.A.1480/Opinion.  *See also* J.A.1336-1338/Harless 471:17-24, 472:24-473:2.  During trial, the District Court described the re-scanning issue as "an exercise in futility," "obfuscation," and a "red herring."  J.A.1107, 1456-1457/J. Morgan 242:16-18; 591:25-592:1.

### D.  Measure of Delay

In presenting her delay results, Kancherla concluded that, in Norfolk, 5% of newly-filed complaints were made available on the day of filing,[15] 25% were made available the next business day, 43% were made available two business days later, and 26% were not made available for three or more business days.  J.A.814/P-6. For Prince William, she concluded that 38% were made available on the day of filing, 22% were made available the next business day, 16% were made available two business days later, and 23% were made available three or more business days later.  J.A.815/P-7.

While Kancherla calculated delays based on what was available on the same day as filing and each day thereafter, "Harless presented his conclusions as number

---

[15] The District Court concluded that Kancherla's opinions were "entitled to significant weight and [were] reasonably consistent with OES statistics," except for her conclusion that only 5% of newly-filed complaints were made available on the same day in Norfolk.  J.A.1482/Opinion. The District Court acknowledged, without criticism, that one reason Kancherla found greater delays than it did is that she utilized the earlier file date as stamped on the complaint as her start date.  *Id.*

of filings available 'within one court day,'" which "include[d] filings that were available on the same day that they were filed <u>and</u> filings that were available on the court day immediately following the day that they were filed." J.A.1479/Opinion. Thus, he failed to offer a measure of delay that was consistent with the measure of delays set forth in CNS' complaint and used by CNS' expert. As the District Court stated, Harless' data was fundamentally flawed because he "could not differentiate between pleadings that were available on the same day they were filed and pleadings that were publicly available on the court day immediately following the day on which they were filed." J.A.1480-1481/Opinion.

Based on its *de novo* review of the OES data, the District Court concluded that in Norfolk, during the Relevant Period, between 19% and 39.3% of new complaints were made available on the day of filing, and in Prince William, between 54.2% and 70.6% of new complaints were made available on the day of filing. *See* J.A.1483-1485/Opinion.[16]

---

[16] Other federal district courts have enjoined state court clerks from withholding complaints (both paper-filed and e-filed) until after processing, including in cases involving delays shorter than those at issue here. *See CNS v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (finding a violation where one-third of complaints were withheld for processing for at least one day, and rejecting position that "[t]he next business day … is immediate enough."); *CNS v. Jackson*, 2009 WL 2163609, *4 (S.D. Tex. July 20, 2009) (rejecting argument that clerk could withhold complaints while they were scanned, indexed, and "verified," and finding the resulting "24 to 72 hour delay in access is effectively an access denial and is, therefore, unconstitutional.").

Based on the testimony of witnesses and its own *de novo* calculation for the August to November 2018 period, the District Court also noted the dramatic improvement in same-day access to new civil complaints following the commencement of this action, and calculated that access approached 90% same day access in both courts in the months after the case began – without the need for additional court personnel.  J.A.1485-1486/Opinion.

## SUMMARY OF ARGUMENT

It is well settled that the First Amendment right of access extends not just to court proceedings but also to documents, in both criminal and civil cases.  The District Court correctly ruled – consistent with the specific holdings of all other federal courts that have addressed this question, and based upon principles articulated by this Circuit – that the qualified First Amendment right of access applies to complaints in civil cases.  Once that right exists, access must be contemporaneous, because even minimal delays deter the informed public discussion of judicial proceedings by withholding the cornerstone content of those proceedings – the complaint initiating an action.

The District Court reviewed delay evidence presented by the parties and their experts and conducted a *de novo* review of the OES data, and determined that significant delays had occurred.  The District Court found that the Clerks violated the First Amendment through their practices and customs, which resulted in

ongoing and pervasive delays in access to newly-filed civil complaints. The Clerks make no attempt to justify their practices and customs that resulted in such delays, or to show that they are narrowly tailored to serve compelling governmental interests.

While access gradually improved after the filing of this lawsuit, that improvement does not moot the case. The Clerks' assertion of mootness runs contrary to the Supreme Court's and this Court's voluntary cessation law and ignores the fact that they did not meet their heavy burden to show that this case is moot. Trial proved that there is nothing to prevent the Clerks from taking away the access they repeatedly refused to CNS prior to this suit, and the positions they took during their aggressive defense of this litigation further demonstrated that any lasting relief required a Court order.

The Clerks also claim the District Court erred by not dismissing this case on abstention grounds. The Clerks moved to abstain based on *Younger v. Harris,* 401 U.S. 37 (1971), *O'Shea v. Littleton*, 414 U.S. 488 (1974), *and Rizzo v. Goode*, 423 U.S. 362 (1976), and, more generally, on principles of equity, comity, and federalism. But the District Court was unpersuaded, finding that "abstention is a principle of defined doctrines," J.A.180/MTD Opinion, and that none of those doctrines applied. *Younger* does not apply since there is no state court proceeding and the case does not fall within the three "exceptional" circumstances; *O'Shea*

24

does not apply because the relief sought and awarded does not invade the merits of any state court proceedings, ongoing or future, and does not require continuous federal policing; and *Rizzo* does not apply because "federalism does not require federal courts to yield matters of constitutional concern when a federal order would not excessively entangle a federal court in the states' own internal affairs," J.A.180/MTD Opinion, and here, CNS requested simple relief to remedy a First Amendment violation. Moreover, the abstention motion was untimely.

Finally, the District Court did not abuse its discretion denying the Clerks' motion to dismiss based on misjoinder. The Clerks claim that the case fails the "transaction or occurrence" test because each Clerk supposedly "processe[s] [complaints] according to the local practices," but then their own brief provides a joint summary of those very practices. *See* Appeal at 6-7. The Clerks also ignore the District Court's finding that granting their motion would result in "duplicative and unnecessary costs" and that having "parallel litigation" would present the risk of "inconsistent interlocutory orders and judgments." J.A.173/MTD Opinion.

## ARGUMENT

**I.  CNS Satisfied All of the Requisite § 1983 Factors, Establishing That the <u>Clerks Violated its First Amendment Right of Contemporaneous Access</u>**

To prevail in this Section 1983 case, CNS had to show that the Clerks, acting under color of law, violated CNS' federal constitutional or statutory rights, and thereby caused injury. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). As

25

the District Court held, the Clerks had practices and customs of withholding access to new complaints until after processing and scanning, which resulted in "persistent and widespread" delays in access that were actionable under Section 1983. J.A.1493/Opinion.[17] The Clerks have not, and cannot, identify anything in the record to the contrary.

Section 1983 liability attaches where the deprivation of constitutional rights was caused by an official policy, custom, or practice. *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690-91 (1978); *Los Angeles Cty. v. Humphries,* 562 U.S. 29, 36 (2010). A policy, custom, or practice can be proved in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle*, 326 F.3d at 471 (internal quotations omitted). "An official policy often refers to 'formal rules or understandings … that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time'… and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville,* 195 F.3d 708,

---

[17] Accordingly, despite the Clerks' claim to the contrary, Appeal at 5, 53, CNS is a "prevailing party" for § 1983 purposes.

712 (4th Cir. 1999) (*quoting Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)). Outside of formal decision making, a custom may arise if a practice is so "persistent and widespread" and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Carter v. Morris,* 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell,* 436 U.S. at 691).

Here, there is no dispute that the Clerks are the custodians of their courts' records, including new civil complaints, and that they have policy making authority with respect to those records. There is also no dispute that the Clerks act under color of Virginia law when they or their employees, who act on the Clerks' behalf, provide or deny access to new civil complaints. Consequently, because the delays in access resulting from policies and customs implemented by the Clerks or their deputies deprived CNS of its First Amendment right of access, CNS met the requirements for relief under Section 1983.

In finding that CNS met the requirements for relief, the District Court found that (1) "there is a federally protected right under the First Amendment … to access newly-filed civil complaints contemporaneously with filing and … such right was violated by [the Clerks];" (2) state officials are "persons" when the plaintiff seeks "prospective, equitable relief" and, here, CNS only requested "prospective, equitable relief;" and (3) "[t]he practices and customs at issue …

were the result of Defendants using their powers bestowed upon them by virtue of their state office."  J.A.1489-1492/Opinion.

**II.     The District Court Correctly Held That There is a First Amendment Right of Access to Newly-Filed Civil Complaints and That Such Access <u>Must be Contemporaneous</u>**

The District Court noted that "[t]he public's right to access judicial records stems from two (2) sources:  the common law and the First Amendment." J.A.1494-Opinion.   The common law right of access, recognized in *Nixon v. Warner Commc'ns Inc.*, 435 U.S. 589 (1978), applies to all judicial records, but more deference is given to restrict access. *See id.*  The First Amendment right of access applies to specific categories of court records and hearings, but where it applies, access limitations are subject to constitutional-level scrutiny. *See e.g., Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 64 (4th Cir. 1989).  The District Court correctly held that "the First Amendment guarantees a qualified right to access newly-filed civil complaints contemporaneously with their filing." J.A.1509/Opinion.

**A.     The First Amendment Guarantees a Right of Access to Civil Complaints**

This Court has made clear that the First Amendment right of access applies to certain filings, both in criminal cases and in civil cases. *Doe v. Public Citizen*, 749 F.3d 246, 265 (4th Cir. 2014).  While this Court has not expressly extended that right to newly-filed civil complaints, the Clerks conceded early on in this case

that a First Amendment right of access "seems likely ... given existing precedent.'"
J.A.1499/Opinion (quoting J.A.62-Prelim. Inj. Opp.).

In analyzing the question of whether the First Amendment provides a right of access to newly-filed civil complaints, the District Court observed that "each federal [district] court to reach this question ha[s] found that the First Amendment applies." J.A.1494/Opinion.[18] And, even though "the federal courts' unanimity is good evidence that the First Amendment applies to this case," the District Court applied its own analysis, based largely on this Court's precedents, and concluded "that the public and press enjoy a qualified First Amendment right of access to newly-filed civil complaints." J.A.1495, 1499/Opinion.

To determine whether the First Amendment right of access applies, courts in this Circuit apply the "experience and logic" test, which has two requirements: (1)

---

[18] Citing *CNS v. Planet*, 947 F.3d 581, 591 (9th Cir. 2020) ("*Planet III*") ("As we held in *Planet I*, and as the district court correctly concluded, a qualified First Amendment right of access extends to timely access to newly filed civil complaints."); *CNS v. Planet*, 750 F.3d 776, 788 (9th Cir. 2014) ("*Planet I*") (describing CNS' First Amendment claim as "cognizable"); *CNS v. Brown*, 2018 WL 318485 (N.D. Ill. Jan. 8, 2018), *rev'd on other grounds*, 908 F.3d 1063 (7th Cir. 2018); *CNS v. Yamasaki*, 312 F. Supp. 3d 844, 860 (C.D. Cal. 2018), vacated and remanded, 950 F.3d 640 (9th Cir. 2020); *Tingling*, 2016 WL 8739010 (recognizing that the Second Circuit found a First Amendment right in *Bernstein*, and issuing a preliminary injunction under that First Amendment right), Transcript Proceeding, Order reported at 2016 WL 8505086 (S.D.N.Y. Dec. 16, 2016); *Bernstein v. Bernstein Litowitz, Berger & Grossman LLP*, 2016 WL 1071107 (S.D.N.Y. Mar. 18, 2016), *aff'd*, 814 F.3d 132 (2d Cir. 2016); *Jackson*, 2009 WL 2163609, at *5.

"whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *Baltimore Sun Co.*, 886 F.2d at 64 (quoting *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10, (1986) ("*Press-Enterprise II*")). The District Court also noted that this Court has analyzed the First Amendment right of access using the "critical components," or analytical test. J.A.1496/Opinion. Under the analytical approach, the question is whether access to the document is "a necessary corollary of the capacity to attend the relevant proceedings." *Doe*, 749 F.3d at 267 (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004)).

The Clerks claim that the First Amendment right of access only applies to judicial documents filed in connection with particular hearings. Appeal at 42.[19] In so arguing, the Clerks focus solely on the analytical approach and completely ignore the "experience and logic" test. *See* Appeal at 31-36. In *Bernstein*, however, the Second Circuit found a First Amendment right of access to complaints under "experience" and "logic" after concluding that the alternate analytic approach "is relevant only after court proceedings have commenced" by

---

[19] The Clerks incorrectly contend no constitutional right of access to complaints exists because CNS has a commercial interest in access. Appeal at 26, 28-29, 35. However, "profit motive is entirely irrelevant to the determination of a news organization's First Amendment rights." *Planet III*, 947 F.3d at 596 n.8. *See also Lugosch v. Pyramid Co.*, 435 F.3d 110, 123 (2d Cir. 2006).

the filing of the complaint itself. *Bernstein,* 814 F.3d at 141. Importantly, the District Court found that a First Amendment right of access exists under both the experience and logic test and the analytical approach. J.A.1499/Opinion. While the presumption of access attaches when a court receives a complaint, *see Planet III*, 947 F.3d at 585, it may be overcome by constitutional-level scrutiny.

1. The Experience and Logic Prongs are Met: There is a Long-Standing History of Access to Civil Complaints and Public Access Plays a Significant Role in the Judicial Process

*The Experience Prong*

The District Court concluded that "[t]here is no dispute that, historically, courts have openly provided the press and general public with access to civil complaints." J.A.1496/Opinion. The Clerks wholly fail to dispute the District Court's conclusion regarding the tradition of access to civil complaints, and instead rely on a single, inapplicable case, *ACLU v. Holder*, 652 F. Supp. 2d 654 (E.D. Va. 2009), *aff'd*, 673 F.3d 245, 252 (4th Cir. 2011), to suggest that this Court should reject a First Amendment right of access to newly-filed civil complaints. Appeal at 33. However, as the District Court correctly noted, *Holder* involved *qui tam* complaints, which "[b]y statute, the peculiar procedure of a *qui tam* lawsuit must be initiated by a complaint filed *in camera*." J.A.1497/Opinion (emphasis in original). CNS does not seek access to sealed or confidential complaints. J.A.1498/Opinion.

31

*The Logic Prong*

In finding that the logic prong had been met, the District Court noted that this Circuit has held that the First Amendment provides a right of access to papers filed in connection with a motion for summary judgment, J.A.1498/Opinion, and that the First Amendment applies in such circumstances because summary judgment is "an adjudication that serves as a substitute for trial." *Id.* (quoting *Doe*, 749 F.3d at 267). Within that framework, the District Court concluded that "[s]imilarly, a complaint frames the issues for trial" and that "[w]hile summary judgment is a substantive resolution of the dispute; in the same vein, the complaint itself is the dispute." J.A.1498/Opinion.

The Clerks try to avoid this Court's precedent by arguing that the First Amendment guarantees do not attach at the moment of filing, and that "the public is likely entitled to view a complaint *in connection with* trial or summary judgment proceedings," but not upon initial filing. Appeal at 35. But a complaint provides the public with detailed information by which it can "supervise the courts and take part in judicial process" – the parties, the alleged facts, the issues for disposition, and the relief sought. J.A.1498/Opinion.

> When a complaint is filed, and the authority of the people of the United States is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends. Logic therefore strongly endorses the historical default that complaints are public

documents. Consistent with experience and logic, the presumption of public access to complaints is protected by the First Amendment.

J.A.1499/Opinion (quoting *Bernstein*, 2016 WL 1071107, at *9). *See also Planet III*, 947 F.3d at 591. As other courts have held, complaints "'initiate judicial proceedings,'" a fact "significant" at "filing," *Bernstein,* 814 F.3d at 140 (rejecting argument that right of access did not apply to a complaint not yet the subject of judicial action), and delaying access to complaints thus "deter[s] … informed public discussion of ongoing judicial proceedings." *Planet I,* 750 F.3d at 787-88; *see also CNS v. Planet,* 614 F. App'x 912, 915 (9th Cir. 2015) ("*Planet II*").

Contrary to what the Clerks have repeatedly (and incorrectly) suggested, CNS does not seek "immediate" and "instant" access to new complaints. CNS seeks only to preserve the history and tradition of access, not conditioned on full administrative processing, which typically means "access on the end of the day in which the case has been filed." J.A.920-921/Girdner 55:25-56:2.

### 2. The Analytical or "Critical Component" Test is Also Met

The analytical approach further confirms a First Amendment right of access to complaints. Like the docket sheets at issue in *Doe* – to which the Fourth Circuit recognizes the First Amendment right of access applies – complaints are a "critical component to providing meaningful access to civil proceedings." 749 F.3d at 268-69. That is because "pleadings can and do properly frame the proceeding and provide outer boundaries on the claims advanced, the materials adduced, and the

redress sought during [the] judicial proceedings. Understanding these boundaries – and knowing what precisely a case is about – is a 'necessary corollary' to the right to attend the proceedings.'" *Bernstein,* 2016 WL 1071107, at *8. As the District Court stated, "[u]nlike discovery filings, housekeeping filings, or other minor court papers, the Complaint is significant for a multitude of reasons. Complaints frame the issues for trial and invoke the power of the Court to resolve a dispute." J.A.1500/Opinion.

### B. The Public and Press Have a Contemporaneous Right of Access to Newly-Filed Civil Complaints

Having determined that there is a First Amendment right of access to civil complaints, the District Court turned to the issue of the scope, or timing, of that right. Quoting this Court's decision in *Doe*, the District Court found that "[w]hen the First Amendment applies to the public's right of access to a particular court document or procedure, the public and press generally have a 'contemporaneous right of access.'" J.A.1500/Opinion (quoting *Doe* 749 F.3d at 272).

Noting that this Circuit has not defined "contemporaneous," J.A.1499/Opinion, the District Court looked at the dictionary definition – "[l]iving, occurring, or existing at the same time," J.A.1499-1500/Opinion (quoting Black's Law Dictionary (11th ed. 2019)) – and then held that "the word 'contemporaneous' means in this context: **on the same day of filing, insofar as practicable and if not practicable within one court day.**" J.A.1500/Opinion (emphasis in original).

In granting CNS a declaratory judgment, the District Court stated that "[b]ased upon the evidence in this case, including but not limited to the OES statistics, a reasonable expectation is that 85-90% of the new civil filings will be accessible to the public and press on the date of filing" in these courts. J.A.1506/Opinion. In its ruling from the bench, the District Court emphasized that the 85-90% expectation was based on the evidence and facts in the case at hand, and that the relevant percentage could vary from court to court.

The Clerks assert that the District Court's decision "entirely displaces the federal common law right to access judicial documents in favor of an unworkable First Amendment right to access" and renders Virginia's Freedom of Information Act ("FOIA") and other open government laws unconstitutional. Appeal at 34. The notion that the District Court's decision has abrogated *Nixon* is absurd. Indeed, the District Court stated that "it is clear that the First Amendment, unlike the common law, does not apply [to] all judicial records and proceedings." J.A.1495/Opinion. Equally illogical is the Clerks' assertion regarding FOIA. CNS is not arguing that all records subject to state FOIA laws are subject to the First Amendment right of access, and the District Court's Opinion has no bearing on Virginia's FOIA.

**III.** **The Clerks Violated the First Amendment by Failing to Provide Contemporaneous Access to Newly-Filed Civil Complaints**

As the Ninth Circuit recognized in *Planet I* and *III,* "CNS's right of access claim implicates the same fundamental First Amendment interests as a free expression claim." *Planet I,* 750 F.3d at 787; *Planet III,* 2020 WL 253562, at *6. That is because "a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," and access to complaints ensures the "constitutionally protected discussion of governmental affairs is an informed one." *Planet I,* 750 F.3d at 785 (quotations omitted). Conversely, "the public cannot discuss the content of … civil complaints about which it has no information," and delayed access thus "deter[s] … informed public discussion of ongoing judicial proceedings." *Planet I,* 750 F.3d at 787-88. *See also In re Charlotte Observer,* 882 F.2d 850, 856 (4th Cir. 1989) ("the value of 'openness' … is threatened whenever immediate access to ongoing proceedings is denied, whatever provision is made for later public disclosure"); *Doe,* 749 F.3d at 272 ("we take this opportunity to underscore the caution of our precedent and emphasize that the public and press generally have a contemporaneous right of access to court documents … when the right applies.").

Implicit in the Clerks' argument is that access to civil complaints "within one court day," i.e., by the end of the court day after the day of filing, does not violate the First Amendment. While there may be circumstances under which

access to complaints is delayed without violating the First Amendment, the reasons for delay ***do*** matter, and those reasons – along with alternatives – must be considered under an analysis of constitutional scrutiny.

### A.      Application of Strict Scrutiny is Required

As required by this Court, the District Court applied strict scrutiny.

> [T]he First Amendment secures a right of access only to particular judicial records and documents... and, when it applies, access may be restricted only if closure is necessitated by a compelling government interest and the denial of access is narrowly tailored to serve that interest....

*Doe*, 749 F.3d at 266.  To survive strict scrutiny, the party seeking to restrict access – here, the Clerks – must prove that the restriction (delaying access until after complete administrative processing) is necessitated by a compelling government interest and is narrowly tailored to serve that interest.  *Id*.  The Clerks have not met this burden.   The District Court also noted that the Clerks could not satisfy intermediate time, place, and manner ("TPM") analysis:   "[B]oth standards of review require [the Clerks] to come forward with evidence, not mere argument, to show that the delays are narrowly tailored to some higher governmental interest…. [The Clerks] cannot satisfy their burden under either test."  J.A.1501/Opinion.[20]

---

[20]  Contrary to the District Court's statement, the Ninth Circuit did not apply the TPM test in *Planet III*, but rather *Press-Enterprise II* scrutiny, which it characterized as "rigorous" scrutiny.  *Planet III*, 947 F.3d at 596.

The Clerks wholly fail to address the issue of constitutional scrutiny – they do not suggest that the delays in access to newly-filed civil complaints are necessitated by a compelling government interest that is narrowly tailored to meet that result (or that the delays meet the TPM test). Given the Clerks' failure to raise these issues in their Appeal, the Clerks have abandoned any arguments to the contrary. *See Mayfield v. National Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012).

### B. The Clerks' Practices and Customs Resulted in Delayed Access to Newly-Filed Civil Complaints

The District Court concluded that "[t]he levels in access prior to this lawsuit are so inadequate as to constitute a practice or custom of making newly filed civil complaints publicly available in a manner that is not contemporaneous with filing." J.A.1502/Opinion. In addition to its own *de novo* analysis of the OES data for general civil complaints, the District Court had before it CNS' tracking data, and the analysis of CNS' expert – all of which make clear that access in the Norfolk and Prince William Circuit Courts was substantially delayed during the Relevant Period. These significant delays in public access to newly-filed civil complaints during the Relevant Period occurred because the Clerks maintained practices and/or customs of making complaints public only after they were fully indexed, docketed, and scanned. Indeed, the Clerks never contested that they fully processed newly-filed civil complaints before making those complaints available

38

on the public access computer terminals.  J.A.1264/J. Smith 399:9-15; J.A.1172-1173/Elford 307:22-308:3; J.A.976/Larson 111:4-13; J.A.1219/Schaefer 354:7-24.

While the Clerks argue that the evidence at trial "failed to account for known, substantial factors beyond the Clerks' control that affect the timing of access," Appeal at 54, neither the Clerks nor their expert could quantify the frequency of such unknown factors.  J.A.1343/Harless 478:13-17.

## C. The Clerks Did Not (and Cannot) Satisfy Their Burden to Demonstrate That Their Policies, Practices, and Customs are Narrowly Tailored to Serve Compelling Government Interests

The Clerks had the burden of "prov[ing] that their policies, practices, and customs are narrowly tailored to serve compelling government interests." J.A.1502/Opinion.  This is an evidentiary burden; unsubstantiated and conclusory assertions will not suffice.  *See, e.g., Doe,* 749 F.3d at 270; *Va. Dep't of State Police v. Wash. Post*, 386 F.3d at 567, 575 (4th Cir. 2004).[21]

The District Court rejected the Clerks' claim that their interests in the "orderly administration of their office and protecting confidential information outweigh the public's First Amendment right to contemporaneous access."  *See*

---

[21] As is true for strict scrutiny, a defendants' burden under intermediate TPM analysis is evidentiary.  "[I]ntermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." *Reynolds v. Middleton,* 779 F.3d 222, 229 (4th Cir. 2015); *id.* at 228 n.4.

J.A.1502/Opinion. By failing to raise these interests or any explanation for how or why the District Court erred, the Clerks have abandoned any argument regarding their inability to satisfy the strict scrutiny burden. *See Mayfield*, 674 F.3d at 377.

Any suggestion by the Clerks that reviewing complaints for confidential information justifies delayed access is belied by the fact that, under Virginia law, it is not the clerk, but the *filer* who has responsibility for redacting confidential information. J.A.1502/Opinion (citing Va. Code § 8.01-420.8(A); 17.1-223(B)(i)). Moreover, the Clerks and their subordinates testified that they perform only a cursory review of newly-filed civil complaints to protect the disclosure of confidential information, and that this review takes a matter of minutes. J.A.972-973/Larson 107:19-108:17; J.A.1175-1176/Elford 310:3-311:7; J.A.1231/Schaefer 366:13-22; J.A.1263/J. Smith 398:7-17.

Significantly, after this suit was filed, access at both circuit courts gradually improved, as court staff began processing complaints more quickly and began allowing CNS to occasionally review complaints before they had been fully processed and posted to the public access terminals. J.A.1163/Abbott 298:15-21. As a result of these improvements, CNS was able to see approximately 90% of newly-filed civil complaints on the day of filing in both the Norfolk and Prince

William Circuit Courts in November 2018. J.A.1483-1485/Opinion.[22] The Clerks failed to offer any evidence that improved access disrupted their offices or put confidential information at risk; they testified that they hired no additional personnel and that no procedures were changed during the period when access improved. J.A.1502-1503/Opinion; J.A.1026/Larson 161:2-15; J.A.1245/J. Smith Tr. 380:13. The District Court correctly held that the Clerks "have proven that they are capable of attaining constitutionally adequate access without impairing their interests." J.A.1503/Opinion.

IV.   **The District Court Did Not Abuse its Discretion in Rejecting the Clerks' Belated Motion for Abstention**

As the District Court observed, this Circuit has rejected abstention as "'a license for freeform ad hoc judicial balancing,'" J.A.180/MTD Opinion (quoting *Martin v. Stewart*, 499 F.3d 360, 364 (4th Cir. 2007)), and has instead "defined specific doctrines that apply in particular classes of cases." *Martin*, 499 F.3d at 364. "Consequently, there is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Id.* at 363; *accord*, *e.g.*, *Timmons v. Andrews*, 538 F.2d 584, 585 (4th Cir. 1976) (where "traditional grounds for abstention" are "absen[t], … a federal court has no power to decline to decide a case that is properly before it"). Critically, abstention is the *exception*, not the rule.

---

[22]   *See also* J.A.816/P-8; J.A.817/P-9 (CNS' expert's analysis); J.A.1136-1138/Abbott 271:13-272:18, 272:25-273:5.

J.A.179-MTD Opinion (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992) (noting that federal courts have a "virtually unflagging obligation" to exercise jurisdiction given to them")).[23]

Abstention is clearly improper here; moreover, the Clerks' motion to abstain was also properly denied as untimely. The Clerks waited to raise the issue several months after filing their first motion to dismiss and after extensive discovery had already taken place. This Court reviews a district court's abstention decision for abuse of discretion. *See Robinson v. Thomas*, 855 F.3d 278, 285 (4th Cir. 2017); *see also Nivens v. Gilchrist*, 319 F.3d 151, 152 (4th Cir. 2003).

### A.    *Younger* **Abstention is Improper**

In its unanimous decision in *Sprint*, the Supreme Court reaffirmed its view that "[c]ircumstances fitting within the *Younger* doctrine … are 'exceptional,'" and include just three instances:  when a "(1) state court criminal prosecution, (2) state civil enforcement proceeding, or (3) state civil proceeding involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions are pending while the federal litigation is ongoing."  J.A.176-177/MTD Opinion (citing *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013)). *Sprint* made clear that *Younger* does not apply outside these specific categories,

---

[23] Other courts have also rejected abstention in similar cases asserting First Amendment violations.  *See, e.g.*, *Hartford Courant*, 380 F.3d at 85-86, 101; *Rivera-Puig v. Garcia-Rosario*, 983 F.2d 311, 319-20 (1st Cir. 1992); *Tingling*, 2016 WL 8739010, at 18.

which "define *Younger's* scope." *Sprint*, 571 U.S. at 78. As the District Court correctly concluded, "there is no state court proceeding in this case, and this matter is not within the three 'exceptional' cases warranting Younger abstention." J.A.179-180/MTD Opinion. Accordingly, *Younger* abstention is inapplicable.

**B.** **The District Court Did Not Abuse Its Discretion Refusing to Abstain Under "The More Generalized Principles of Federalism" or Under *O'Shea* or *Rizzo***

In arguing that the District Court should have abstained, the Clerks rely almost entirely on the Seventh Circuit's decision in *Brown*, claiming that *Brown* "made new law" that supports their proposition that they have "a significant interest in running their own clerks' offices ... filing procedures," and that it is improper for a federal court to find such procedures unconstitutional. Appeal at 37-39. But the Clerks do not explain how this decision can be reconciled with the rule that abstention is only defined by "specific doctrines." They also make no mention of other adverse decisions, including, most notably, the Ninth Circuit's decisions in *Planet I* and *III* rejecting abstention in cases that do not fit into these "specific doctrines."

Relying on *Brown*, the Clerks necessarily fail to recognize that such limitations were not followed by *Brown*, which by its own acknowledgement based abstention not on *Younger*, *O'Shea*, or *Rizzo*, but rather on "the more general principles of federalism that underlie all of the abstention doctrines" and "[a]gainst

the backdrop of *Younger*, *O'Shea* and *Rizzo*." *Brown*, 908 F.3d at 1071, 1073. The *Brown* decision is exactly the kind of "ad hoc judicial balancing" condemned by the Fourth Circuit in *Martin* (and the Supreme Court in *Sprint*) and also by the Ninth Circuit in *Planet I* and *III*. Additionally, an examination of the specific parameters of *O'Shea* and *Rizzo*, cited by the Clerks, confirms this conclusion.

      1.    *O'Shea*

While *O'Shea* held that the relief sought by plaintiffs would result in "nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger* ... and related cases sought to prevent," the relief contemplated was considered "a major continuing intrusion" because it would lead to "continuous or piecemeal interruptions" of future state court proceedings by "any of the members of the … broadly defined class." *O'Shea*, 414 U.S. at 500-02. The Clerks provide no basis for why or how *O'Shea* is applicable here. Accessing court records on a contemporaneous basis does not "inhibit a court from resolving cases or enforcing its orders" and "does not implicate a core judicial function." J.A.179/MTD Opinion. And, as the District Court noted, "[w]hile some future litigation may take place to enforce this Court's order, if it were to grant one, that does not rise to the

level of a federal audit that would caution against exercising jurisdiction." J.A.180/MTD Opinion (citing *Planet I*, 750 F.3d at 792).[24]

The Clerks also fail to even mention *Planet I* and *III*, which expressly reject dismissal of similar claims on *O'Shea* grounds. In *Planet I*, the Ninth Circuit reversed the district court's dismissal on *O'Shea* grounds and noted that the case "presents an important First Amendment question … that should be decided by the federal courts" and that "CNS's requested relief would not excessively intrude on sensitive state functions." *Planet I*, 750 F.3d at 779. In *Planet III*, the Ninth Circuit noted its "disagree[ment]with [*Brown*'s] decision to abstain from resolving the dispute about when the right attaches and when delays are so long as to be tantamount to a denial of the right." *Planet III*, 947 F.3d at 591 n.4.

### 2. *Rizzo*

The present case is also far afield of *Rizzo*, where the district court entered an order requiring city officials to prepare, for the district court's approval, a "comprehensive program for improving the handling of citizen complaints alleging police misconduct." *Rizzo*, 96 U.S. at 365. The proposed program, which was then incorporated into a final judgment, required, *inter alia*, an "all-encompassing

---

[24] *O'Shea* abstention is also improper here because the adjudication of delays in access is ancillary and peripheral to the adjudication of the merits of the court proceedings to which those records pertain. When the federal action is merely peripheral in this way, the concerns regarding equity, comity and federalism that underlie both *Younger* and *O'Shea* "have little force." *Steffel v. Thompson*, 415 U.S. 452, 462 (1974). *See also Gerstein v. Pugh*, 420 U.S. 103, 108, n.9 (1975).

14-page" manual governing police misconduct complaints" *Id.* at 366 n.2. *Rizzo* held that the district court's injunction was "beyond the scope of federal equity power," ***not*** that the district court should have abstained from hearing the case at all. *Id.* Thus, *Rizzo* has no bearing where, as here, the District Court's declaratory relief left the details of the Clerks' compliance entirely up to them. *See* J.A.180/MTD Opinion.

Contrary to the Clerks' reliance on *Brown*, and as to *Rizzo*'s application here, "[f]ederalism does not require federal courts to yield matters of constitutional concern when a federal order would not excessively entangle a federal court in the states' own internal affairs." J.A.180/MTD Opinion. Indeed, 42 U.S.C. § 1983 gives *federal courts* the jurisdiction to "issue relief against persons who, under color of *state law*, deprive another of a right secured by the *federal* Constitution." *Id.* (emphasis added).

## C. The District Court Did Not Abuse Its Discretion in Denying the Clerks' Abstention Motion as Untimely

Instead of raising the abstention issue with their initial motion to dismiss, the Clerks waited for over five months, and the District Court's alternative basis for denying the motion, for its untimeliness, was also within its discretion. As the District Court correctly observed: "'To jump ship now would be to exhibit a callous disregard for the meaningful litigation that has already occurred in the federal court system.'" J.A.175/MTD Opinion (quoting *Hill v. Snyder*, 878 F.3d

193 (6th Cir. 2017)).  While the Clerks cite to *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984), they ignore its central holding that when federal litigation has moved beyond the "embryonic stage" and there have been "proceedings of substance," then "considerations of economy, equity, and federalism counsel against … abstention."  467 U.S. at 238.  The District Court accounted for those considerations and did not abuse its discretion in finding the Clerks' abstention motion untimely.

## V.     The District Court Correctly Found the Case Not Moot and Its Issuance of Declaratory Relief Was Proper

The Clerks argue that the evidence at trial "failed to satisfy the 'sufficient immediacy' requirement for declaratory relief" because "CNS conceded at trial that it is no longer experiencing delays in access" and there was "no evidence showing any change to the Clerks' policies and procedures."  Appeal at 49.  Alternatively, but relatedly, the Clerks claim that the District Court should have found CNS' claims moot because CNS was receiving the access it sought and there "was no evidence of a voluntary cessation."  *Id.* at 49-50.  For similar reasons, both arguments fail.

With respect to declaratory judgments, this Court has held that:

[A] federal court may properly exercise jurisdiction in a declaratory judgment proceeding when three essentials are met: (1) the complaint alleges an "actual controversy" between the parties "of sufficient immediacy and reality to warrant issuance of a declaratory judgment;" (2) the court possesses an independent basis for jurisdiction over the

parties (e.g., federal question or diversity jurisdiction); and (3) the court does not abuse its discretion in its exercise of jurisdiction.

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 591 (4th Cir. 2004). In determining whether a declaratory judgment was properly granted, "the question … is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Volvo Constr. Equip.*, 386 F.3d at 591 ("We review de novo the issue of whether a district court possessed jurisdiction in a declaratory judgment proceeding [and] review for abuse of discretion a district court's decision to exercise its jurisdiction [to issue a declaratory judgment].").

With respect to mootness, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." J.A.1488/Opinion (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)). *See also 6th Cong. Dist. Republican Comm. v. Alcorn*, 913 F.3d 393, 407 (4th Cir. 2019). Were it otherwise, "courts would be compelled to leave [t]he defendant … free to return to his old ways." *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014). This rule is "subject to the caveat that an injunction is unnecessary when there is ***no*** reasonable expectation that the wrong will be repeated." *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001) (emphasis in original). "But this

exception is just that – an exception – and defendants 'face a heavy burden to establish mootness in such cases.'" *Id.* (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 71-72 (1983) (per curiam)).

To meet their heavy burden, the Clerks must show "subsequent events [make] it ***absolutely clear*** that the allegedly wrongful behavior could not reasonably be expected to recur." *Deal v. Mercer Cty. Bd. Of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018) (emphasis in original). Courts in the Fourth Circuit look for a change in official policy or law, or some other external constraint on the defendant's past action. "In the absence of such a constraint, when a defendant retains the authority and capacity to repeat an alleged harm, a plaintiff's claim should not be dismissed as moot." *Davison v. Plowman*, 191 F. Supp. 3d 553, 557 (E.D. Va. 2016); *accord Porter v. Clarke*, 852 F.3d 358, 365 (4th Cir. 2017); *accord Deal*, 911 F.3d at 192. "Furthermore, a defendant's persistence in his belief that his challenged actions were legal indicates a risk the defendant will repeat those actions." *Davison*, 191 F. Supp. 3d at 557 (citing *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) and *Lyons*, 243 F.3d at 800).

As the evidence at trial showed, there was never a permanent correction of an acknowledged error. First, the Clerks insisted throughout this case that no delays in access ever actually occurred. J.A.53-56/Prelim. Inj. Opp.; *see generally*

ECF 54-EDVA.  Second, although the Clerks have demonstrated, post-lawsuit, their ability to provide contemporaneous access on the day of filing, they steadfastly deny CNS is legally entitled to it.  Third, there is nothing to prevent delays from recurring.  Before CNS filed this lawsuit, both Clerks refused to allow CNS to see new civil complaints until after they had been processed and posted to public access terminals, resulting in delayed access.  After CNS filed this lawsuit, access at both courts gradually improved, through a combination of quicker processing and ad hoc exceptions to their policies and practices of allowing access only after processing.

There are no external factors that would prevent the Clerks (or any successor clerks) from taking away these ad hoc policy exceptions at any time, and the Clerks continue to have capacity and authority to do so.  *See Davison*, 191 F. Supp. 3d at 557 (burden to prove mootness not met where defendant "does not put forward any change in official policy or other restraint on his ability to again" violate the First Amendment); *Wall*, 741 F.3d at 497.

While CNS may not have been experiencing unconstitutional delays at the time of trial, there was still an actual controversy of "sufficient immediacy" and the case was not moot.  As the District Court noted, "there is no evidence of a formal policy or other means to show that the alleged unlawful delays cannot reasonably be expected to reoccur."  J.A.1488/Opinion.

**VI.** **The District Court Acted Within Its Discretion to Deny the Clerks' Motion to Sever Claims on Misjoinder and Venue Grounds**

The Clerks argue that the District Court erred in denying their first motion to dismiss, contending that Smith was misjoined and venue was improper. According to the Clerks, this lawsuit is a "textbook case of misjoinder," and the claims against Smith should have been severed and transferred to the Alexandria Division, while the virtually identical claims against Schaefer were litigated in the Norfolk Division. Appeal at 50-53. Since the claims against the Clerks are "nearly – if not completely – identical," J.A.172-173/MTD Opinion, and CNS brought this case in the Eastern District of Virginia, the federal judicial district within which the Prince William Circuit Court Clerk's office is located and operates, the District Court did not abuse its broad discretion in denying the requested severance on misjoinder and venue grounds. *See Saval v. BL, Ltd.*, 710 F.2d 1027, 1031-32 (4th Cir. 1983).

Misjoinder

Federal Rule of Civil Procedure 20(a)(2) provides that defendants can be joined in the same action if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and if "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). As noted by the District Court, Rule 20(a) should be "construed in light of its purpose, which is to promote trial convenience and expedite the final

51

determination of disputes, thereby preventing multiple lawsuits." J.A.170/MTD Opinion (quoting *Saval v. BL, Ltd*, 710 F.2d at 1031). Joinder must be interpreted in the "broadest scope" and is "strongly encouraged," *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 724 (1966), and the Clerks have failed to overcome this strong presumption.

The Clerks claim that the District Court abused its discretion by denying their motion to dismiss, because the allegations are "predicated upon the local policies and procedures employed by each Clerk for the handling of newly-filed civil complaints." Appeal at 50. However, the District Court found that the Clerks' "accepting, docketing, and filing of newly-filed civil complaints constitute a series of transactions or occurrences for the purposes of Rule 20 as each [Clerk] describes utilizing nearly identical processed in each of their offices." J.A.172/MTD Opinion. Notably, the Clerks do not describe the processes used in their Courts for handling new civil complaints separately; they summarize the steps for both courts only once, in one section of the Appeal. *See* Appeal at 6-7. The District Court also noted that what the Clerks were demanding would result in "duplicative and unnecessary costs" to both the parties and the courts. J.A.173/MTD Opinion. Moreover, having "parallel litigation … would also present a risk of the [Clerks] within the same judicial District being subject to inconsistent interlocutory orders and judgments." *Id.*

<u>Venue</u>

The Clerks also assert that the District Court incorrectly found that divisional venue was proper. Appeal at 50-53. Eastern District of Virginia Local Civil Rule 3 states that divisional venue is determined by using the federal venue statute and reading "division" instead of "district." *See* E.D. Va. Loc. R. Civ. P. 3(C). Applying that instruction, the applicable divisional venue rule provides: "[a] civil action may be brought in a [division] in which any defendant resides, if all defendants are residents of the State in which the [division] is located." 28 U.S.C. § 1391(b)(1) (as adjusted by E.D. Va. Loc. R. Civ. P. 3(C)). Both Clerks are residents of Virginia and the Eastern District of Virginia. J.A.174/MTD Opinion.

Thus, the District Court correctly found that the Prince William Clerk was correctly joined and that divisional venue was appropriate in the Norfolk Division for both Clerks. As such, the District Court did not abuse its discretion denying the Clerks' motion to dismiss and this Court should affirm that proper denial.

## CONCLUSION

CNS brought this lawsuit because the Clerks' policies, practices, and customs delayed access to newly-filed civil complaints and prevented CNS' reporters from seeing them on the day of filing. As a result, new matters of public controversy in the Clerks' courts could not be reported on in a contemporaneous manner, the open and public nature of those courts was shaded, and the First

Amendment violated.  The evidence presented at trial established that there was no good reason – and none that met constitutional scrutiny – for the delays in access to newly-filed civil complaints.  While the Clerks took measures that eventually resulted in better access to new complaints, they fought this case to the last ditch and can revert to prior practices at any time.  Accordingly, CNS respectfully requests that this Court affirm the Opinion and Order of the District Court.

Dated:  June 26, 2020

Respectfully submitted,

*/s/ Heather S. Goldman*
Heather S. Goldman
Bryan J. Harrison
**BRYAN CAVE LEIGHTON PAISNER LLP**
1155 F Street, NW, Suite 700
Washington, DC 20004
Telephone: (202) 508-6000
Fax: (202) 508-6200
heather.goldman@bclplaw.com
bryan.harrison@bclplaw.com

William J. Hibsher
**BRYAN CAVE LEIGHTON PAISNER LLP**
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 541-2000
Fax: (212) 541-4630
wjhibsher@bclplaw.com

Conrad M. Shumadine
**WILLCOX & SAVAGE, P.C.**
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Telephone: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com

*Counsel for Appellee Courthouse News Service*

<u>**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify:

1.　　The attached complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).  The attached contains 12,967 words (according to the Microsoft Word 2010 count function), excluding those parts exempted by Federal Rules of Appellate Procedure and 32(f).

2.　　The attached complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6). The attached has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

*/s/ Heather S. Goldman*
Heather S. Goldman

# CERTIFICATE OF SERVICE

I certify that on June 26, 2020, a copy of the foregoing was served on all counsel of record, listed below, through this Court's CM/ECF system.

William D. Prince IV
Michael G. Matheson
*THOMPSON*M**C**M**ULLAN**, P.C.
100 Shockoe Slip, 3rd Floor
Richmond, Virginia 23219
wtunner@t-mlaw.com
wprince@t-mlaw.com
mmatheson@t-mlaw.com

*Counsel for Defendants-Appellants*

*/s/ Heather S. Goldman*
Heather S. Goldman